May it please the Court, today I'd like to focus on some tensions that are inherent in the bankruptcy system and how those tensions interact with the lower Court's clearly erroneous factual conclusions about Steve Smith's service as a bankruptcy trustee. I'll also focus on the question of whether Steve pursued the due process that he was owed in the IFS Show Cause hearing and the constitutionality of 11 U.S.C. 324B as applied in this case. And unless the Court has questions about our facial challenge or our arguments regarding the denial of estate pending appeal, I'll stand on our briefing for those questions. Well, I have the question. You just said clearly erroneous factual conclusions because, of course, that's factual determinations because that's the standard. I get that. Yes, Your Honor. The problem I have here is it seems to me Mr. Smith has repeatedly admitted he should not have charged the estate for much of the expenses that are in question, you know, maybe some but not all of them, and that that was an error in judgment and so forth. His contention is it was an error in judgment, it was innocent, et cetera. The contention on the other side is it was intentional, you were hoping to get away with it, you were trying to hide it, and it wasn't until, you know, the light was shown on it that you started backtracking. That is a quintessentially factual determination. How the heck can three judges sitting here in New Orleans gauge Mr. Smith's credibility and what was in his heart? It's hard enough to do live. As the trier of fact, it's much harder to do, you know, this many miles removed. So how can we possibly do that? I think that the questions that were at issue as far as the factual determinations here were all about judgment calls, about whether Steve should have stayed at this hotel or that hotel or whether he should have spent this amount of money on food. No, it wasn't. What it was is, and let's be really clear here, he didn't show up with an itemized bill, you know, $1,200 from the Roosevelt Hotel for four nights, da-da-da-da-da, Blanche's airfare, my airfare. He showed up with $29,000 of mysterious expenses and just said, here, here, pay that. He thought that he was applying the complicated formula that the parties had agreed to and that Judge Isker had approved. Okay, I have—that is a factual determination, because that looks to me—I mean, I can remember going down on a fee app and having to defend why we used FedEx instead of the U.S. Mail to send a particular document. It was that detailed of a questioning that I got as counsel for the debtor from the, you know, one of the creditors. So it seems to me that a guy of his lineage and vintage in this area knows you can't just show up with $29,000 in expenses with no itemization at all. Well, and Blitz and the UST did have access to the itemization before the distribution hearing. Okay, only after they asked for it, right? I mean, he just sent in a, I want $29,000. They did ask for it. And then they had to ask for it, and then they had to keep digging to get the whole story out, that there were kids and, you know, all this stuff about coming in Saturday and all that came in dribs and drabs. Now, that may be totally innocent, and I'm sure you think it is. But that is, to me, a quintessentially factual determination as to whether you buy his story or not, which on its face is completely preposterous. But I think the way that Judge Isker approached this here is he didn't look at the New Orleans expenses in isolation. He looked at them in the context of, and that's the phrase he used, in the context of things that had happened in the past. And all of the things that had happened in the past were issues that Judge Isker had approved, that Steve had taken actions, that he had hired his own firm. And Judge Isker said, you can hire your own firm. And he had, the parties had reached a settlement that made them all happy. And Judge Isker said, I approve of that settlement. Y'all can go forward with that settlement. And so I think for Judge Isker to view the New Orleans expenses in the context of, quote unquote, things that he had approved in the past, I think he was trying to turn back the He had decided at some point that he was not happy with, but at the time, he approved them. And I think that's a problem. I think it's a problem of due process. I think you could throw out the entire rest of this man's life and look at this one thing and it's good enough to support what happened, because this, in my view, is highly outrageous what he tried to do. If you believe that he did so intentionally, which is what Judge Isker concluded, could it be an accident? It could be, but it seems very unlikely to me. But I think if you look at the context of what happened here, Judge Isker looked at a very similar situation in the C&C case, which is in our briefing and I'm sure the court is familiar with it. It's in the record. And he decided that under the clear and convincing evidence standard, which is what he applied in C&C and in this case, that that did not support Steve's removal because there were facts that created hesitation in his mind. But he keeps doing that. We keep having, you know, I've seen this with lawyers sometimes when I was on the trial bench. You have lawyers that keep messing up. The first mess up, you think, oh, you know, it happens, everybody makes mistakes. As it continues to go on, you go, you know, now I'm starting to see a pattern, now I'm getting concerned. The next one, I don't know if I'm going to be so lenient. We could certainly look that that's the context that Judge Isker is finding. I just find this difficult for an appellate court to say, and a quintessentially factual finding like this, if it went the other way and blitz were appealing, I don't know that even though I think this is outrageous, I don't know that I could inject my view on that. I understand, Your Honor. I just, I think that we have to look at everything that happened the way that it happened, and I don't think we can take what happened with regard to the New Orleans expenses in isolation because Judge Isker did not. And I think that that's the state of the record that we have before it, and we have to, Judge Isker did these things in context, and I think that we have to take him for his word. And in context, the things that he used to support Steve's removal were actions that he approved in the past. Let me ask you a question about the scope of the removal. I understand that the bankruptcy judge removed him as trustee of cases in which he was pending trustee. Is that a permanent ban of being trustee? Does that mean he'll never be appointed trustee again? Steve's removal? It's really, most of that is up to the United States trustee. There is a sitting panel of bankruptcy trustees. I understand that. So what's the operative effect of this? If this Court affirms Steve's removal? Yeah, I mean, it's one thing to be removed, whatever. I'm talking about, really, the judge's remedial response to his found, what he felt was inappropriate conduct. But accepting that finding is sound, I wonder if we're going to focus on whether this is a—it's exactly the—it's an appropriate response to it. A permanent ban as trustee to approach a bankruptcy lawyer as a—it's severe. It is severe. And perhaps that's appropriate, perhaps it's not. I mean, do you speak to that? I mean, how does he reinstate himself? So to speak. Well, we're not asking to be reinstated to the cases that he's been removed from. We're asking for an opinion that basically clears his reputation and allows him to serve in the future. I understand you want to upset—say that he never should have done that, but if you're not successful in that, I'm—my question is the issue of what is this ban? I think it's—to me, it's two different things, but the case takes on a different dimension in my thinking if this is a lifetime ban of a bankruptcy lawyer from being a trustee because he overcharged on a trip to New Orleans and he had some other limited thing. I don't think it is a de jure lifetime ban. I think that it is a de facto lifetime ban. I don't think that the United States trustee is required to remove him from the panel. I think that it probably will if he does not prevail on appeal. Judge Isker removed Steve because he thought the reimbursement request was a breach of his—or, excuse me, put his own interests over his fiduciary duty to the estate, and Judge Hughes affirmed that removal in an opinion that suggested that he had not actually reviewed the record. For example, he notes that Steve was removed from 12 cases when Steve was removed from over 100. He also implied that Steve improperly took money from the estate even though a trustee's management of his estates is more akin to a dependent administration in a probate proceeding where nearly every action requires court approval. I think it's important to emphasize that Steve has never received money from any estate that was not approved by a court beforehand. But the dependent administration aspect of this bankruptcy system, I think, is important here because it means that any trustee who wants compensation is basic—by asking for that compensation is essentially putting his own interests over the estate and can't avoid doing so. It's in the estate's best interest to give as much money as possible to its creditors. And a trustee who wants to get paid out of that same pile of cash is inherently in conflict with that. And that's especially true when you consider that under the clear language of the bankruptcy code, a trustee is not, quote-unquote, entitled to any money until the bankruptcy court says he is. So every request for reimbursement is at that moment money the trustee is not yet entitled to. And if that's the standard, then we have to accept that bankruptcy trustees can be removed for breach of fiduciary duty for asking for money that they're not entitled to in every case because— Yeah, but this is more—to me, the thing that distinguishes this from just asking for, you know, attorney's fees for a motion that the judge thinks was a waste of time and so doesn't award it, that's fairly garden variety. The thing that converts this, in my mind, is the effort to hide it. You don't think it was an effort to hide it. Mr. Smith says it wasn't an effort to hide it. Judge Isker found it the contrary, and that to me is different from an attorney just coming in and asking for fees or expenses that somebody determines, well, that's a little—you stayed it too nice of a hotel, or you filed a motion that wasn't worth anything or whatever. I think if you look at the initial pre-bills, the initial expenses that Steve did submit in response to Blitch's objection, I think that doesn't support a conclusion that he tried to hide those expenses. If you look clearly at the list, most of them are for copies, and so they're one line for a dollar here or $10 there for copies, it just says laser copies. And that means that anything with any substance behind it, like the New Orleans expenses, stands out like a sore thumb. These are— But that's only after Blitz asked, right? Yes. I mean, so if Blitz had been asleep at the wheel or missed a deadline or they'd been doing other things, this $29,000 would have gotten paid, and your own client admits it was an error to ask for the $3,000 whatever. Well, he— I'm sorry. He would have been paid money he's not entitled to had Blitz not paid attention and said, we want some backup, and started pursuing it. And it seems like the more people ask, the more we start learning more about this trip. Well, first of all, I don't think it's a foregone conclusion that this money would have been paid if Blitz had not objected, because I think that Judge Isger also has—he has a statutory duty to look over these and— He has nothing to look over. He has a document that says I spent $29,000 in expenses. Well, and he—if he thought that Steve was not entitled to reimbursement without the itemization, then he certainly could have and probably should have—or probably would have, excuse me, asked for it. And Your Honor mentioned that Steve has admitted that the whole $3,400 was a mistake, and that's not an accurate portrayal of the record. He admitted that Tuesday night, the Tuesday night expenses were a mistake. But Judge Isger— I mean, I read his testimony. He kept saying, I shouldn't have done this, I shouldn't have done this, I shouldn't have done that. He didn't parse it out like that. He basically said, you know, looking back, I realize how this looks, and so on and so forth, and he kept admitting that. And that's actually, I think, an effort to look good to the court. It wasn't like he said, oh, there was this one little oversight. I mean, the whole trip, there is some amount of expenses he's entitled to, I understand. And I understand why two lawyers came out of a problem with that. But there's really no way a private client would have paid for it. But if they had, it would have been only because they would have been told in advance, hey, I'm going to come to New Orleans, I'm going to spend, you know, four nights or whatever, and there's going to be client meetings. There's going to be a purpose to it, and then the client can decide. Here we have none of that. And I mean, in bankruptcy, it just is so weird to me, because you have to have so much detail. That's why this strikes me as so weird that a person of his experience would not know that. And, Your Honor, all I can say to that is that he thought that the parties had come to an agreement and that he was applying the agreement properly. That, I can't change the record on that. But Judge Isker gave him a large number of the New Orleans expenses, and it was really just the Tuesday night that was No, he didn't give him Saturday night, he didn't give him the Roosevelt Hotel, he didn't give him all the meals. He didn't give him all the money. No, he didn't give him all the money, but he did give him a large chunk of it. He gave him the airfare, which was ridiculous, even charging the coach. I mean, it's ridiculous for two people to spend $900 coming to New Orleans. I've come to New Orleans enough to know that. And I don't know, the record doesn't show whether they were last-minute tickets. The record does not tell us why the tickets were expensive as they were. That's the number that Judge Isker accepted, and that's the number that he gave Steve. The code provides for a proper balance of the conflict between the estate's interests and the trustee's interests, and that balance comes from the court's ability to reject the requests just like it did here. And I think for Judge Isker to reject that request and then look back at it and say, oh, and these things that happened years ago that I approved are context to support Steve's removal, I think that's a due process problem. Steve had, yes, some of the cases were listed in the show cause order, but how could he have had any meaningful opportunity to prepare to answer questions? What was the judge talking about, about hiring his own law firm? I thought that was not an uncommon practice. I'm sorry, Your Honor? I said, I don't quite understand what the judge was talking about when he seemed to be upset because he was hiring his own law firm. What is the practice in that regard? I'm not familiar with bankruptcy practice in the Southern District of Texas, but from my understanding, it's very common to hire your own law firm, and the statute allows for it. I think there is a point in the record at which Judge Isker says, I can't tell you, you know, black letter law, that you can't hire your own law firm because the statute allows for it. Thank you. Thank you, Your Honors. Thank you. May it please the Court, my name is Robert Schneider, and I represent Judy Robbins, United States Trustee. Judge Higginbotham raised a couple of questions that I want to address before I move on. I'll start with the one that you just addressed. Trustees can't hire their own law firm, but they have to show that it's in the best interest of the estate to do so. And the Court's concern in each of the instances here that he raised was that it wasn't clear that it was in the best interest of the estate to do so. In the Inter-Americas case in 2005, he actually denied the request to employ Mr. Smith's firm, so it did not work out in Mr. Smith's favor, as his counsels say. And in the CNC situation, the only reason the judge didn't remove him was because one of the attorneys that he solicited said that . . . who he solicited after the Court questioned why he wanted to hire his firm, said that Mr. Smith had been forthcoming with some information. And that was enough under the clear and convincing standard for the Court to not pull the trigger, but he was very clear he would have pulled the trigger under the preponderance standard, which we say should apply. And the only reason he didn't pull the trigger there was because of one attorney that actually said he's been helpful to him. The other question that Judge Higginbotham raised that I wanted to address was the future effect of what happened. And it's important to recall what Mr. Smith has not lost. He hasn't lost his ability to make a living because he's a lawyer. He has not been banned from practicing in bankruptcy court. He hasn't been banned from representing trustees. In fact, in some of the cases in which he was removed, he was actually employed as counsel by the trustee. He's also not lost his ability to request compensation in the cases in which he was removed. In fact, in several of the cases in which he was removed, he successfully did seek and receive compensation. And he also has not been deprived of his ability to receive future trustee appointments. And that was, I think, what you were specifically going through. He was removed from the case in which he was in, but for him to be removed from the panel of trustees to receive future appointments, he would have to go through an administrative review process in which he could request a review from a senior department justice official, after which he would be able to seek review by an Article III court, after which he could seek appellate review by this court. So... And that process hasn't happened or been instituted? It's in stasis right now. We're waiting to see how these appeals work out. It is a process. It just hasn't... It hasn't even been instituted. I mean, it's . . . what's in stasis is the appeals. I think that he is going to wait and see how the appeals work out to decide whether he's going to resign or retire or whatever. And if he doesn't, then the U.S. trustee will have to decide what the U.S. trustee wants to do. That hasn't happened. Hasn't started. And I'm not sure what, in addition to what happened in this case, the U.S. trustee might want to take into account. I'm the U.S. trustee's appellate lawyer, but I'm not her employee, and so I'm not involved in that case. And I wouldn't be involved in that case. So for right now, we're only talking about the removal from the existing cases and not removal from future cases. It's entirely possible he wouldn't be removed from the panel, but it's also entirely possible he would be removed from the panel. It's not something . . . That's a separate process. It's a completely separate process. Okay. What is your answer to this issue of the 2009, you know, lack of notice that 2009 was going to be in play? Because that seems to be their best argument. I would say that the removal . . . it was very clear that the order to show cause itself pointed out the judge's concern was with the 2013 expense request with regard to the expenses incurred in 2011. Okay? That was very clear. There's no question about the notice with regard to that. The decision to remove him was also based on the intentional, as Judge Haynes pointed out, the intentional submission of an un-itemized request for expenses that were ultimately deemed, after the backup was provided, to be excessive. Although the Court did refer to the 2009 situation, first of all, he asked questions about it at the hearing, and Mr. Smith was able to respond to the question. Mr. Smith hasn't said subsequently what additional answer he would have provided. I think he'd provide the same answer. The judge said, you brought an action . . . He didn't say what he would have done differently. He didn't say what he would have done differently. There's no prejudice, and that's why it would be harmless error at worst, because he hasn't been prejudiced by the addressing of that. If you subtract out the 2009 situation, the same thing happened. That's my answer with regard to that. Okay. What about the argument that now, if we affirm this, then everybody who submits a FIAP and or a request for expenses, who's in a fiduciary capacity with the estate, is subject to not just not getting reimbursed, but all of this horrific situation? Well, certainly every expense applicant knows that under 330A, to be reimbursed for expenses, that's Section 330A of the Bankruptcy Code. I'm going to say statutory provisions and not say Bankruptcy Code. I know it. I'm sorry about that, but I'm talking about the Bankruptcy Code. Under Section 330A, you can only be reimbursed for necessary expenses. Okay? Under Bankruptcy Rule 2016— But we all know that everybody can disagree about that. Well, that's correct. I mean, I might think I need to stay at a nicer hotel so I get a good night's sleep to make my terrific argument. Somebody else might think I could stay at a flea bag motel and sleep just as well, and therefore, the $150, $200 hotel may seem excessive to some people and may seem cheap to others. How am I supposed to know which judge you are if I'm filing my fee at? Well, first of all, you would supply the detail, I would like to think, because obviously, if you don't supply the detail, you should expect that you're going to have a problem. If you supply the detail and the court determines based on the court's experience, not just experience as a judge, experience with the case, experience with you personally, I think that—and I don't mean you personally, I mean the applicant personally—and here that's what the Bankruptcy Judge did, he brought into play not just his experience, not just his experience with fee requests generally, and what is and what isn't reasonable in these circumstances, and his experience in this case, but also his experience with Mr. Smith. And his experience with Mr. Smith showed past situations where he seemed to be preferring his law firm to the interest of the estate, and remember here, the reimbursement is to Mr. Smith's law firm, and the submission was— But what about her argument that, you know, he got all that approved? So in other words, Judge Isker, in her view, is coming down on him for something that Judge Isker approved, and that seems kind of like— What I pointed out earlier, in the 2005 Inter-America situation, he didn't approve it, he denied it. I mean, it's a published decision, he denied it. Subsequently, the parties worked something out, and the settlement was approved, but in the 2005 Inter-America situation, he denied it. In the CNC payroll situation, he only, like I said, he only let it go. The 2009 situation, he was concerned with regard to the way Mr. Smith was addressing certain situations, and again, I think like 2005, the parties worked out a settlement that the court ultimately did approve, but he didn't say that he was fine in retrospect with the initial thing that happened. You know, he approved the settlement afterwards of something else. So the fact that the court—in fact, CNC was just weeks before. The judge said, I would have pulled the trigger on you, but for this one thing, and I mean, I haven't seen two motions to order show causes to remove a trustee within a month. I mean, how he could think the second time, it's confusing to me that they say, he approved everything I did before. More likely, he should say, Judge Isker has got a problem with me. I should probably maybe put a little bit more detail in, because Judge Isker has raised issues in the past. That would probably be a reasonable thing a judge might say. Unfortunately, sometimes, attorneys may develop a situation over years with a judge where they say, this judge is going to expect more from me, and then they should know that because of their . . . just like I said, the judge has experience with the attorney, the attorney has experience with the judge. So I don't think that we're going to have a state or a district, a district of attorneys who are scared to submit expense requests. They should be submitting accurate, detailed, and requests for only necessary things . . . So if he had submitted the detail from the start and said, here's the deal. I took my wife, who's a co-counsel, and my kids, and we did this, and here's why, and here's all the expenses, and I throw it on your lap, Judge Isker, to decide what's fair because I don't want to advocate against the estate or whatever. I think, you know, these are the expenses I incur, and I'm asking you to give me what's fair. Do you think that would have been a different circumstance? It would have been a different circumstance, a factual circumstance, and we don't know what . . . Different outcome. Well, removal outcome or denial of expense outcome? No, different removal outcome. Clearly, expenses aren't going to get paid either way. Well, I was about to say, I'm pretty confident that if they'd been disclosed, they would not have been made. The judge did not say what he would have done in that situation, so I don't want to speculate what he would have done. Obviously, the fact that it was not itemized was a problem for the judge, too. He spent time in his decision discussing that, so . . . What expense would he have cut out? I'm sorry? What expense, if it had been itemized, would he have very quickly cut out and not . . . I can only assume the same ones. He gave them one night, like I just spent, and one meal, like I just had. I was going to say, I bet you've been really careful. Well, first of all, I work for the government. I have to be kind of careful regardless. But in any event, yes. But I would have to assume that if the judge thinks that a night is reasonable, he would have thought a night was reasonable. Otherwise, he just might not have been his man if it hadn't been hidden. But I don't know, and he did not say, so I can't quite guess. Well, to me, the hiding problem goes to his intent, because I think this is a case about intent. If he intended to just do what was right, and he just . . . you and I have a different view of what's right, that happens. I mean, that certainly happens, and lawyers have that happen to them all the time, where the judge cuts their fees or whatever, and nobody's ever suggested that makes them bad people. But here, the hiding, to me, is what begins to make this look different from the ordinary, the judge just thinks you charge too much, and, you know, judges tend to trim fee apps regardless of what they think of the lawyer. I mean, that just tends to happen, for better or for worse. We agree. We think that it's not a question of an extra couple of nights, an extra couple of days, an extra couple of dollars, an extra couple of people. It's the hiding aspect that makes this bad. And he had a chance to explain that. I mean, the transcript is clear. He asked questions about his intent in preparing the application, and he responded to them. And the judge, with years of experience as a district court judge, I mean, as a bank district court judge, listening to people in trials and hearings, giving their testimony, determined that he did not credit that testimony. So it's a credibility determination with regard to whether it was intentional or not. And, of course, Mr. Smith says it's not, because everybody always says that it's not, and the judge has to make that call, and the judge did make that call, and the judge is entitled to make that call with regard to not only the testimonial evidence, but the documentary evidence, and even inferences with regard to the evidence that the judge made. You know, one thing that's quite clear about our bankruptcy judges, they are an impressive bunch, a great testament to merit selection, I must say, because with a lot of exception, they bring a lot of experience as practitioners to the bench. So I think that's neither here nor there, except that it is a practitioner who has been there and done that, who is passionate on this, and this is not some naive neophyte. But that's true across the bench. There is a really high quality of judiciary, and we're very proud of it. They make mistakes, too. That's correct. Sometimes we do. That's right. But the reviewing court, I don't want to tell the reviewing court what a reviewing court can and can't do, but the reviewing court, as Judge Haynes has already pointed out, doesn't substitute its judgment for the judgment of the court that had the hearing. I guess trial court. I could say trial court, even spanking. The other thing I would suggest to you is that just the one day is a little strict. It is not an uncommon, if the case, I don't know anything about the case, if the case is of some complexity, it's not uncommon for practitioners to, in my experience, to be at least one more day coming to prepare one day here to get away from the phones and so on and so forth. But then that was frankly my experience, but that was a client paying the bill and not my fiduciary thing. There is that. And the only testimony in that regard was the expert witness who testified that he wouldn't have gone more than two days. That's right. Well, he wouldn't have brought his six-year-old kids in the same room to get away from it all. Well, if you want to get into the detail of the explanation. I respect the challenges parents face when they're both working and all that. This is not a criticism of that, but it does. It's billing of the estate. It's not the bringing the family. It's the billing of the estate. You can bring your extended family for a month for all I care. You don't bill the estate for it. That's the problem. And I think that's the bankruptcy court's problem. And the not disclosing it, put it over the top. Well, I just didn't want to start creating a one-day rule kind of thing universally. I understand the differences that you make here, of course, but. Well, he charged for four, right? Right. I mean, I'm not sure that. Well, beyond the one versus two. And even though the expert said he wouldn't have done that. That's right. And Judge Isker didn't say, I have a one-day rule or something like that. So I don't think we have to have that concern necessarily. Well, you have to come down the day before because you may not get here if you don't. That's. We at least know that. The judge has touched on that. We would like to come down in the morning. You don't dare do that. So one day is built into it. I don't think anybody will be able to change that. I only have a couple seconds left. I'll just reiterate. We'll try to use them then. I'll just say that there is no due process problem because he received notice in a hearing, and that's all the due process required. Thank you. Thank you, sir. Good afternoon. Good afternoon, Your Honors. Kel Mercer on behalf of Blitz Holdings Corporation. I wanted to focus on a comment from Ms. Dunn, and it was the tension that she argued exists here in the system. My practice is 100 percent bankruptcy. I represent trustees. I know this process. Now, Mr. Smith has been doing this a lot longer than me, but I'll tell you that anybody that does this knows that when you submit a fee application, there's no way that you can submit I want to be paid $29,000. I do this all the time. You submit all of your invoices, all of your backup. It's a must. So what happened here and the tension . . . We have to fill out forms too, so . . .  It is part of the practice of being a lawyer or a judge. Well, and Judge Isker certainly is familiar with whatever is expected in the Southern District, as is Mr. Smith. That's correct. More familiar than we would be. And I think the point of the lack of detail is it ultimately . . . Judge Isker was faced with deciding was this, in fact, a lapse in judgment or, as he found after hearing everything, was it an intentional act to withhold these bills from scrutiny? And Judge Isker, after having heard everything, decided that it was the latter, that it was an intentional act to keep these bills from being scrutinized. Now, I want to talk briefly about the . . . I don't have a lot of time, and I wanted the U.S. trustee to be able to speak as much as possible. Sorry. But the idea that the 1999 issue should not have been brought up, I would say that Mr. Smith opened the door for all three of these issues when he decided to put his entire historical record . . . Well, and he brought them up first, right? He brought up 2009, not the exact incident, but he brought up 2009 first. Is that right? And I participated in the trial. My recollection is that what Mr. Smith led with was his historical record. I have been a trustee for 34 years and have an exemplary record of being evaluated by the United States trustees. And then . . . and bear in mind, that's when it all came forward. Judge Isker was asking direct questions as if he were a party litigating. And so Mr. Smith was on the witness stand being asked questions directly from Judge Isker. And then Blitz asked additional questions. And so what you're saying is you kind of live by the sword, die by the sword. If you're going to get up and say, judge me on my record, then the judge is going to say, all right, you got this, that, and the other problem. Well, and that's exactly right. And one other thing on the 2009, Judge Isker never went and said all of that was fine, I approve it. He was asked to approve a compromise between Blitz and the estate, and he did. He approved that because the evidentiary record had been met to approve that compromise. But that was never him saying, I bless this situation and resolve everyone. And was that related to this same proceeding that's in 2013? I mean it seems like this is an ongoing, long process here. It's not. It's not related. It's not really. I mean the fact is that there were hundreds of contested matters in this bankruptcy case, which has been going on since 2002. But it's the same. The 2009 event was in the same overall case or not? Yes. Okay, that's what I meant. It was. So it's not like we're talking about bringing up something from a totally different case. It's just you have a series of contested matters of which the 2009 is one, and then this appeal that he's going down and having the oral argument on is another. Yes. Well, the appeals flowed from an adversary. In the same bankruptcy. In the same bankruptcy. Okay. Yes. Yes. And so they were directly related to this bankruptcy case, and Smith, we argue, had opened the door to an analysis. How long has this entire bankruptcy proceeding been going on that these are children of, so to speak? Children are probably out of school. Yeah. This bankruptcy case was filed in 2002. And it's still ongoing? It is still ongoing. Okay. And the 2009 and 2013, they're both offshoots of the same in-ray bankruptcy. Both of those occurred in this bankruptcy case. Your Honor, I'm very close to being out of time. I just wanted to conclude by saying that this appeal turns on the factual determinations made by Judge Isker and the exercise of his discretion. And this court is well aware of the standards by which those factual findings are reviewed, and we believe they are fully supported by the record and that Judge Isker got it right. Thank you, sir. Shannon Dunn? Yes, Your Honor. Very quickly, Your Honors. Mr. Schneider mentioned that Steve's application to employ his firm in 2005 was denied, and that's correct, but it is also misleading. His application was denied without prejudice, and Judge Isker eventually gave him permission to hire his firm as part of a settlement. So to say that was denied is not the complete truth here. Mr. Schneider also mentions that he works for the government, and as I'm sure Your Honors are aware, the government has a per diem rate, and it's not in the record. But the per diem rate for meals in New Orleans is $71 per person per day. Judge Isker gave Steve $37.50 per person per day, which means that if Judge Isker himself came to New Orleans on business, he would be entitled to more money from the taxpayers than he allowed Steve to take, and I just wanted to clear that up. Justice Enoch did not testify that he would not have brought his children, but he did testify that he would bring his wife, who is not an attorney, who does not have anything to do with the estates, and she comes with him on these trips. And Steve took his family's expenses out. He did not even attempt to charge the estate for any of the money related to his children, not their airfare, not their food, not the movies that they watched while they were in the hotel room, and the hotel room was free with regard to the children. So I wanted to emphasize that fact. Both Mr. Mercer and Mr. Schneider made interesting points with regard to the way that Judge Isker treated Steve. Excuse me. Mr. Mercer basically admitted that Judge Isker acted like a litigant here, that Judge Isker questioned Steve as if he were Steve's opponent in this case, and he did. And Mr. Schneider said, and I believe this is as close to a direct quote as we can get in these quick circumstances, if Judge Isker has a problem with me, I should be careful. Under these circumstances, the problem that Judge Isker had with Steve was in his head, especially with regard to the 2009 problem. The 2009 issues were not in the show-cause order, but a large chunk of what Judge Isker asked Steve during the show-cause hearing was about 2009. But do you think the judge has to give notice that we're going to talk about stuff that happened in the very bankruptcy for which you are a trustee? I think it's that. That seems weird because I realize it's a long, ongoing bankruptcy, and we're all, you know, getting older while it's going on. But nonetheless, it seems to me that's different from bringing up some totally different case that nobody has any idea what you're – oh, my gosh, I don't remember that one. I think that if – I think the length of the bankruptcy does make a difference here. This bankruptcy had been going on for 11 years at that point. Steve had made possibly thousands of decisions in that case, and he made them all in front of Judge Isker. And so if Judge Isker in his head can think back and say, gosh, I really didn't like when Steve did that in 2009, I'm going to bring that up at the hearing tomorrow. And he actually said on the record, these things were really bothering me last night while I was preparing for the hearing. I think in a bankruptcy of this length and of this complexity, yes, you need to put on paper this is what we're going to talk about. These are the actions that you've taken that I have a problem with. Okay. What – as we sit here today, what could Mr. Smith have told Judge Isker about 2009 that would be different than what he was told because he would have more time to find this out? In other words, what difference would the time have made if he had been told a day or two in advance? I have not asked Steve that question. Okay. Well, isn't that necessary for you to know to show that it's more than harmless error? I don't – I mean, I have to say that I don't think so. I think that there has to be some kind of standard for notice if notice is going to mean anything at all. If the standard is notice and a meaningful opportunity to be heard. Right. So we can find error, but there's also a standard for when error is harmless. Judges commit errors all the time. They let in evidence they should and they keep out evidence they shouldn't, and we say, did it matter? And if you can't say how it mattered, it's harmless error. And I think here it did matter if you're looking back at the fact that 2009, which was a settlement, but if Judge Isker was unhappy with the terms of the settlement or what he thought the settlement might lead to, then I think he had a duty to deny approval of that settlement, and he did not do that. He approved the settlement, which he didn't have to do. He did. Before I leave, Mr. Mercer pointed out, he said that Steve opened the door, and I think that's an inaccurate reading of the record because I don't think there was a door to open here when you look at this in the context of the bad acts that Judge Isker used against Steve to support his removal for the New Orleans expenses were all things that had been resolved in his favor by Judge Isker in this case. And if we're asking Steve to remember every single thing that he had done in the 11 years of this case, then I think it's not unfair to ask Judge Isker to remember you could have disapproved those actions at the time, and you chose not to do so. So I don't think that there was a door for Steve to open here. Judge Haynes, quickly, you asked me earlier about whether you could overturn Judge Isker's factual conclusions here. Not really whether I could. Well, not whether you could. And I think the Court understands that we have standards of review, and I think the standard of review to apply here is clear and convincing evidence, and I think that's the standard that you look at is this clear and convincing evidence to support what Judge Isker did. So you think if Judge Isker properly concluded that he intentionally was trying to pull one over on the estate by getting expenses he knew he wasn't entitled to, that that is not sufficient to support the outcome here? If that's what he concluded, never mind whether he should have. But if that is . . . I think that if that is a correct conclusion based on the evidence, then it would be, but I think it is an incorrect conclusion based on the evidence. Your best argument is that someone who has been practicing this thing for 34 years suddenly is going to try to pull one off on the Court. That's probably the strongest piece of your argument, I must say. Does the Court have any further questions? Thank you very much, Your Honors.